# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as User ID 92202324, with the account name of "Joey," User ID 95723498, with the account name of "Joeyy," User ID 95803763, with the account name of "Joeyyy," User ID 95699417, with the account name of "Jayy," User ID 95992122, with the account name of "Joeyyy," and User ID 66705024, that is within the possession, custody, or control of OfferUp | Case No. 2:21-2311 |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☒ Evidence of a crime;
☒ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

18 U.S.C. § 922(g): Felon in Possession of Firearm or Ammunition; 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Manufacturing and Dealing in Firearms without a License; 26 U.S.C. § 5861(d): Receipt or Possession of a Firearm Not Registered Under the National Firearms Act

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

*/s/ Marlene Lopez*
_____
*Applicant's signature*

Marlene Lopez, ATF Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: _____

_____
*Judge's signature*

Rozella A. Oliver, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Sara Milstein (x8611)

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the below-listed accounts, collectively referenced as the "SUBJECT ACCOUNTS," identified as belonging to ALEXANDER GABRIEL MANGANDI ("MANGANDI") with phone number 323-815-2479, that is within the possession, custody, or control of OfferUp, a company that accepts service of legal process at 227 Bellevue Way NE #57, Bellevue, Washington, 98004 or through email at records@offerup.com, regardless of where such information is stored, held, or maintained:

        a.    User ID 92202324, with the account name of "Joey" ("SUBJECT ACCOUNT 1");

        b.    User ID 95723498, with the account name of "Joeyy" ("SUBJECT ACCOUNT 2");

        c.    User ID 95803763, with the account name of "Joeyyy" ("SUBJECT ACCOUNT 3");

        d.    User ID 95699417, with the account name of "Jayy" ("SUBJECT ACCOUNT 4");

        e.    User ID 95992122, with the account name of "Joeyyy" ("SUBJECT ACCOUNT 5"); and

        f.    User ID 66705024 ("SUBJECT ACCOUNT 6").

## ATTACHMENT B

## ITEMS TO BE SEIZED

### I. SEARCH PROCEDURES

1.    The warrant will be presented to personnel of OfferUp (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

i

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

II.   **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, limited to that which occurred between January 1, 2021 and the date of this warrant,[6] including:

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNTS, including stored or preserved copies of messages sent to and from the account,

---

[6] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

        ii.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNTS, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

        iii. All photos and videos uploaded by that user ID, including TruYou photos, as well as any metadata associated therewith, including, specifically, EXIF data;

        iv.  All profile information; recent activities; notes; groups and networks of which the user is a member, including the group's OfferUp identification number; Ad postings; buyers and sellers contacted by the user; advertisements "liked" or visited by the user; notifications and notification settings of any kind; and information about the user's access and use of OfferUp or third-party applications or "apps" and any "shares" – i.e. content shared with other OfferUp users;

        v.  All other records of communications and messages of any kind made or received by the user, including all private or instant messages or "chats," and specifically including all attachments to any messages in their native formats (for example, if a .zip file was sent to another user,

the .zip file shall be provided), and history of communications of any kind;

vi.  All "Active Sessions" information and activity logs for the account and all other documents showing the user's posts and other OfferUp activities;

vii. All search history and web history for the user of the SUBJECT ACCOUNTS, including records of OfferUp searches and internet/web searches, and including web browsing that might occur outside of OfferUp, but that OfferUp is able to connect to the SUBJECT ACCOUNTS when the SUBJECT ACCOUNTS visit websites that are using OfferUp's advertisement functionality;

viii.  Any credit card numbers provided by the user for purchases on or through OfferUp;

ix.  All "check ins", "last location", and other location information;

x.  All privacy settings and other account settings, including privacy settings for individual OfferUp posts and activities, and all records showing which OfferUp users have been blocked by the account;

xi.  All information about the user's access and use of OfferUp;

xii. All information about connections between the account and third-party websites and applications;

xiii.  All information related to the SUBJECT ACCOUNTS's membership in any groups, including the identity of other accounts in the same group, and information identifying

any groups or organizational pages or accounts for which the
SUBJECT ACCOUNTS are an administrator;

      xiv. All push token or device token identifiers;

      xv.  Facial recognition data;

      xvi. All records pertaining to communications
between the PROVIDER and any person regarding the SUBJECT
ACCOUNTS, including contacts with support services and records
of actions taken.

      b.  All other records and information, including:

      i.  All subscriber information, including the
date on which the account was created, the length of service,
the IP address used to register the account, the subscriber's
full name(s), screen name(s), any alternate names, other account
names or email addresses associated with the account, linked
accounts, telephone numbers, physical addresses, and other
identifying information regarding the subscriber, including any
removed or changed names, email addresses, telephone numbers or
physical addresses, the types of service utilized, account
status, account settings, login IP addresses associated with
session dates and times, as well as means and source of payment,
including detailed billing records, **and including any changes
made to any subscriber information** or services, including
specifically changes made to secondary email accounts, phone
numbers, passwords, identity or address information, or types of
services used, and including the dates on which such changes
occurred, for the following accounts:

      (I)  the SUBJECT ACCOUNTS.

(II) any other account accessed by a device with an identifier responsive to the device identifiers called for in paragraph 10.a.xiv.

(III)    any other account associated with the SUBJECT ACCOUNTS, including by means of sharing a common secondary, recovery, or alternate **email address listed in subscriber records** for the SUBJECT ACCOUNTS or by means of sharing a **common phone number or SMS number listed in subscriber records** for the SUBJECT ACCOUNTS, and any account that lists the SUBJECT ACCOUNT as a secondary, recovery, or alternate email address.

ii.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNTS described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made;

iii. Any information identifying the device or devices used to access the SUBJECT ACCOUNTS, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module

("SIM"), Mobile Subscriber Integrated Services Digital Network
Number ("MSISDN"), International Mobile Subscriber Identifier
("IMSI"), International Mobile Equipment Identity ("IMEI"), or
Apple advertiser ID or ID for advertisers ("IDFA") or Google's
AAID or any other advertiser ID, and any other information
regarding the types of devices used to access the SUBJECT
ACCOUNTS or other device-specific information, including the
device type, brand name, device mode or operating system, and
first and last times that a device were observed.

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11. For each SUBJECT ACCOUNT listed in Attachment A, the
search team may seize:

a. All information described above in Section
II.10.a. that constitutes evidence, contraband, fruits, or
instrumentalities of violations of Title 18, United States Code,
Sections 922(g)(1) (Unlawful possession by convicted Felon), 18
U.S.C, 922(a)(1)(A) (Engaging in the Business of Manufacturing
and Dealing in Firearms without a License), and Title 26, United
States Code, Section 5861(d) (Receipt or Possession of a Firearm
Not Registered Under the National Firearms Act) (the "Subject
Offenses"), namely:

i. Information relating to who created,
accessed, or used the SUBJECT ACCOUNTS, including records about
their identities and whereabouts.

ii. Information related to how and when the
SUBJECT ACCOUNTS were accessed or used;

iii. Records, communications, and information regarding the purchase or sale of firearms or firearm parts on OfferUp;

iv.  Records, communications, and information regarding any plan or effort to obtain a weapon or weapons;

v.  Records, communications, and information regarding OfferUp policy and procedure, and locations for transactions to occur;

vi. Records, communication, and information regarding any steps taken in furtherance of the scheme, transfers of cash, and the coordination to obtain firearms.

vii. Information relating to co-conspirators engaged in the Subject Offenses, which could include information relating to their identities, whereabouts, communications, and methods of contact and communication;

b.  All records and information described above in Section II.10.b.

## IV.  PROVIDER PROCEDURES

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

Bureau of Alcohol, Tobacco, Firearms, and Explosives
Attn: Marlene Lopez
888 South Figueroa Street, Ste. 1750
Los Angeles, California 90017
Phone: 818-740-1237
Fax: 213-228-0011
Email: marlene.lopez@atf.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.   IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States. Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

x

**AFFIDAVIT**

I, Marlene Lopez, being duly sworn, declare and state as
follows:

## I.   INTRODUCTION

1.   I am and have been a Police Officer with the Los
Angeles Police Department since November 2007.  I am currently
cross-designated as a Federal Task Force Officer ("TFO") with
the United States Department of Justice, Bureau of Alcohol,
Tobacco, Firearms, and Explosives ("ATF") assigned to work the
Los Angeles Field Division, where I participate in
investigations involving, prohibited persons possessing
firearms, persons trafficking firearms, persons possessing
illegal firearms and sales of controlled substances.  During my
time as a Task Force Officer, I have participated in multiple
ATF operations with federal special agents and local police
involving the investigation of violations of firearms and
narcotics laws.

2.   Prior to my current assignment, I was assigned to the
Operations South Bureau - Community Safety Operations Center
Surveillance Unit.  While assigned to the surveillance unit, I
assisted detectives with locating and apprehending violent
criminals.  During my tenure as a law enforcement officer with
LAPD, I was assigned to the 77th Street Area as a patrol officer
where I participated in dozens of investigations regarding
violent crime, illegal narcotics, and illegal possession of
firearms.  During my time as a patrol officer, I interviewed
criminal suspects, as well as victims and witnesses of crimes.

I have also participated in investigations focusing on gang activity.

3.     I make this affidavit in support of an application for a warrant for information associated with the following six accounts believed to belong to ALEXANDER GABRIEL MANGANDI ("MANGANDI") with phone number 323-815-2479 (collectively the "SUBJECT ACCOUNTS"), that is stored at premises controlled by OfferUp (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 227 Bellevue Way NE #57, Bellevue, Washington, 98004.[1]

        a.    User ID 92202324, with the account name of "Joey" ("SUBJECT ACCOUNT 1");

        b.    User ID 95723498, with the account name of "Joeyy" ("SUBJECT ACCOUNT 2");

        c.    User ID 95803763, with the account name of "Joeyyy" ("SUBJECT ACCOUNT 3");

        d.    User ID 95699417, with the account name of "Jayy" ("SUBJECT ACCOUNT 4");

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

      e.   User ID 95992122, with the account name of "Joeyyy" ("SUBJECT ACCOUNT 5"); and

      f.   User ID 66705024 ("SUBJECT ACCOUNT 6").

    4.   The information to be searched is described in Attachment A.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

    5.   As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence,

---

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

contraband, fruits, or instrumentalities of criminal violations of Title 18, United States Code, Sections 922(g)(1) (Unlawful possession by convicted Felon), 18 U.S.C, 922(a)(1)(A) (Engaging in the Business of Manufacturing and Dealing in Firearms without a License), and Title 26, United States Code, Section 5861(d) (Receipt or Possession of a Firearm Not Registered Under the National Firearms Act) (collectively, the "Subject Offenses").

6.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   <u>SUMMARY OF PROBABLE CAUSE</u>

7.     The ATF, working with LAPD, has been investigating the sale of firearms by unlicensed firearms dealers using online marketplace platforms, including the PROVIDER, OfferUp.  One particular suspected seller, MANGANDI, offered to sell a firearm to an undercover ATF agent in communications that took place via the PROVIDER's chat platform, via text message, and over the phone.  MANGANDI ultimately sold what he represented to be a firearm to the undercover agent on April 7, 2021, and offered to sell additional firearms to the undercover agent in a subsequent transaction.

### III.  STATEMENT OF PROBABLE CAUSE

**A.    Law Enforcement Learns Of Suspicious Gun Sales Taking Place Online**

8.   On or about April 5, 2021, officers from the LAPD Southwest Division told ATF Special Agent ("SA") Nicole Lozano that they appeared to have seen numerous gun sales taking place through the online marketplace website called OfferUp.[3]  SA Lozano did her own searches on OfferUp and found SUBJECT ACCOUNT 1, which appeared to be offering guns for sale.

9.   Suspecting that the OfferUp user may be dealing in firearms without a license, on or about April 6, 2021, SA Lozano called the OfferUp law enforcement telephone number to try to identify the account user who was posting the firearm sale advertisements using Offerup.  A Senior Manager with OfferUp sent SA Lozano a copy of MANGANDI's California identification card, which contained his photograph, biographical information, and his residential address.

10.  SA Lozano asked the OfferUp Senior Manager for a list of other OfferUp accounts associated with MANGANDI's known account.  SA Lozano then learned that MANGANDI was associated with each of the SUBJECT ACCOUNTS, each listing 323-815-2479 as

_____

[3] OfferUp is an online marketplace that facilitates the buying and selling of used goods by creating an online arena where customers can post or search for goods to buy or sell. Interested parties communicate and arrange a transaction using the OfferUp app, and then meet face-to-face to complete the transaction.  OfferUp, and other online marketplaces such as LetGo and FaceBook Marketplace, are optimized to be used on mobile device apps most commonly found on cell phones.  OfferUp conducts transactions in, through, and affecting interstate commerce through its websites and application.  For example, among other services available through OfferUp is a nationwide shipping service customers may use.

the phone number of record ("MANGANDI's number").  Upon
reviewing basic account information for the SUBJECT ACCOUNTS, I
learned:

        a.   While all of the SUBJECT ACCOUNTS are linked to
MANGANDI's number in the PROVIDER's records, some of the SUBJECT
ACCOUNTS also appear to share other attributes.  For example,
SUBJECT ACCOUNTS 1, 2, 3, and 5 are listed under the name "Joey"
with variation in the number of y's at the end of the name.
SUBJECT ACCOUNTS 2, 3, and 5 have the same profile photograph
that appears to read "Strike 80," which I know in my training
and experience to be a brand that manufactures gun parts.

    11.  In an attempt to learn more about MANGANDI, the
SUBJECT ACCOUNTS, and any illegal firearms transactions,
investigators arranged for an undercover ATF Officer (the "UC")
account to contact SUBJECT ACCOUNT 1 using the PROVIDER's
platform.[4]

        **B.   MANGANDI Sells A Firearm To An Undercover ATF Officer**

    12.  On or about April 6, 2021, the UC sent a message to
SUBJECT ACCOUNT 1 using OfferUp's internal messaging platform.
The UC asked the SUBJECT ACCOUNT whether the UC could buy two
fully built handguns available for sale.  SUBJECT ACCOUNT 1
answered in the affirmative, noting that the firearms were
"ready to go" and were "900" with a "mag included".

_____

    [4] Records from the UC officer's account reflect that the UC
was communicating with an OfferUp Account called "Joey," with
only one Y.  Because there are no other known MANGANDI-linked
accounts bearing the name "Joey" with only one Y, I believe the
UC was communicating with SUBJECT ACCOUNT 1.

a.    The UC and I understood SUBJECT ACCOUNT 1's response to mean that there were two fully functioning handguns available for purchase, was charging $900 each, and would include a handgun magazine for each firearm.

13.    SUBJECT ACCOUNT 1 then sent a UC a message with MANGANDI's number, and the UC began communicating via text message with MANGANDI's number.  The user of SUBJECT ACCOUNT 1, suspected to be MANGANDI, sent to the UC photographs of a disassembled Polymer80 handgun with an attachment on the end of the barrel.  MANGANDI noted that the barrel attachment of the gun could be removed in order to attach a silencer/suppressor.

a.    I believe the photographs depicted a Polymer80 gun because in photographs sent to the UC, the frame of the disassembled gun has the word "Polymer80" printed on it.  Based on my training and experience, I know that a Polymer80 gun can be manufactured to be a "firearm" under federal law.

14.    MANGANDI told the UC that, in order to purchase a firearm that was functional, MANGANDI would need to meet with the UC in person.  MANGANDI provided the UC with a meeting location of 8532 Long Beach Blvd., in South Gate, California, which is a shopping center (the "Shopping Center").  The UC told MANGANDI that the UC would contact MANGANDI the next day to confirm the details to complete the purchase.

15.    On April 7, 2021, the UC contacted MANGANDI via MANGANDI's number.  MANGANDI told the UC that he had recently received an order of 20 firearms and was therefore running

behind in production.  MANGANDI would need until later that
evening to complete the UC's purchase order.

16.  On the evening of April 7, 2021, the UC contacted
MANGANDI via MANGANDI's number.  MANGANDI told the UC that he
was delayed again in completing the UC's order for a handgun,
but that MANGANDI had a functional AR-type rifle ready for
purchase.  MANGANDI added the rifle barrel length was 7.5 inches
and the cost was $1,100, but that MANGANDI could convert the
aforementioned rifle to function fully automatic, and quoted the
price of $1,500.

17.  Later that same evening, the UC spoke over the
telephone with MANGANDI via MANGANDI's number.  During the
conversation, MANGANDI advised the UC that he could not
manufacture the short-barreled rifle to function fully
automatic.  MANGANDI confirmed the sale for the short-barreled
rifle for $1,100.  MANGANDI agreed to meet the UC at the
Shopping Center in South Gate.

18.  On the evening of April 7, 2021, the UC met with
MANGANDI at the Shopping Center.  I was present on surveillance,
along with other law enforcement with whom I have spoken and
whose reports I have read, and I have also spoken with the UC.
Based on this information, I am aware of the following:

a.  MANGANDI was driving a black, 4-door Audi bearing
CA license plate 8FRC423 (the "Audi").

i.  The person who met with the UC appeared to
be MANGANDI, based on a comparison between the appearance of the
person meeting the UC and the person pictured in the California

8

identification card photograph that the OfferUp Senior Manager
showed to SA Lozano.  Also, using law enforcement databases, I
learned that Audi is registered to a female (not MANGANDI) at
MANGANDI's address of record, the same address listed on his
California identification card.

b.    After MANGANDI and the UC parked at the Shopping
Center, MANGANDI and the UC greeted one another, and both walked
to the Audi.  MANGANDI retrieved a white United States Postal
Service ("USPS") box from the Audi, opened the trunk of the Audi
and placed the box inside of the trunk.  MANGANDI then removed
from the box a disassembled AR-Type rifle and placed it inside
of the Audi's trunk.  The UC asked MANGANDI whether the firearm
was operable or if it was missing any parts.  MANGANDI confirmed
the firearm being fully functional, and he assembled the AR-type
rifle in front of the UC.

c.    During the course of the transaction, MANGANDI
told the UC that he has been manufacturing firearms for a long
time and that he has a machine that allows him to manufacture
high quality firearms.  MANGANDI explained to the UC how the
rifle can be converted into a fully automatic rifle using a
specific part that is inserted above the trigger guard.
MANGANDI stated the 20 firearms he mentioned in earlier
conversations were already paid for by another buyer.  MANGANDI
offered to sell the UC two handguns later that same evening, but
would have to go to his off-site storage site to get them.
MANGANDI confirmed the handguns were $900 each.  MANGANDI added

that he needed to be cautious because he did not want to be
caught by law enforcement.

        d.   After he finished assembling the firearm for the
UC, MANGANDI placed the firearm in the white USPS box.  The UC
counted $1,200 in cash and gave the money to MANGANDI in
exchange for the firearm.

            i.   ATF SAs have determined that the gun
MANGANDI sold was a firearm, as defined by federal law.  ATF SAs
have sent out the item MANGANDI sold to the UC to determine
whether it qualifies as either a pistol or a short-barreled
rifle.  Results are pending.

        e.   MANGANDI then spoke with the UC about possibly
selling to the UC later that night the two handguns MANGANDI
kept in his off-site storage place firearms.  After leaving the
Shopping Center with MANGANDI's firearm, the UC tried to contact
MANGANDI to complete the second transaction.  MANGANDI did not
respond to the UC and therefore the second transaction did not
take place.

   **C.   <u>MANGANDI Is A Convicted Felon And Is Prohibited From
        Possessing Firearms</u>**

19.  From my review of  Consolidated Criminal History
Reporting System, I know that, on June 26, 2013, MANGANDI was
convicted of first degree robbery, in violation of California
Penal Code section 211, for which he was sentenced to 365 days
in jail and 3 years' formal probation.

D.   **MANGANDI Is Not A Licensed Federal Firearms Dealer**

20.   Through the ATF's Industry Operations Investigator, who performs license database checks, I learned that MANGANDI's name and biographical information and did not find any record that MANGANDI holds a federal firearms license.  Therefore, I believe that MANGANDI sold a firearm to the UC without possessing a federal firearms license.

21.   Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNTS by other means.

IV.   **TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES AND USE OF THE PROVIDER'S PLATFORM**

22.   From my training, my experience, and the collective experiences related to me by other law enforcement agents who specialize in engaging in the business of manufacturing and dealing in firearms without a license, I am aware that:

a.   Individuals who engage in unlawful sales may use social media platforms such as the PROVIDER to plan, prepare, and coordinate such transactions using various features of those platforms, including, but not limited to direct messaging.  In doing so, these individuals may send messages or other communications to potential prohibited possessors (as discussed above), as well as to criminal associates and co-conspirators, including discussing the manufacturing firearms and other logistics and planning in preparation for the transaction.

b.   Individuals who engage illegal sales may utilize social media to share photographs of their products.

c.   Individuals who engage in illegal sales may also use social media to post or send photographs of the proceeds of platforms.  Such evidence may indicate if an individual was near the location of the sale in this case.

**V.   BACKGROUND ON SOCIAL MEDIA AND E-COMMERCE PLATFORMS**

23.   In my training and experience, I have learned that providers of email and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNTS. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an email or social media account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other email addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

24.   Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services,

such as account access information, email or message transaction
information, and account application information.  In my
training and experience, such information may constitute
evidence of the crimes under investigation because the
information can be used to identify the user(s) of a SUBJECT
ACCOUNT.

25.  A subscriber of the PROVIDER can also store with the
PROVIDER files in addition to emails or other messages, such as
address books, contact or buddy lists, groups, social network
links, calendar data, pictures or videos (other than ones
attached to emails), notes, and other files, on servers
maintained and/or owned by the PROVIDER.  In my training and
experience, evidence of who was using an account may be found in
such information.

26.  In my training and experience, email and social media
providers typically retain certain transactional information
about the creation and use of each account on their systems.
This information can include the date on which the account was
created, the length of service, records of login (i.e., session)
times and durations, the types of service utilized, the status
of the account (including whether the account is inactive or
closed), the methods used to connect to the account (such as
logging into the account via the provider's website), and other
log files that reflect usage of the account.  In addition, email
and social media providers often have records of the Internet
Protocol ("IP") address used to register the account and the IP
addresses associated with particular logins to the account.

Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

27.   In my training and experience, email and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of emails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

28.   Users of accounts are often required to include an email account as well as a phone number in subscriber records. The email account may be an email account hosted at the same provider, or an account at a different provider.  The email account is referred to by a number of names, such as a secondary email account, a recovery email account, or an alternative email account or communication channel.  That email account is often used when the identity of the user of the primary account (here, a SUBJECT ACCOUNT) needs to be verified, for example if a password is forgotten, so that the provider can confirm that the person trying to access the account is the authorized user of

the account.  Similarly, the telephone number used in subscriber records is often used to send a passcode via text (or "SMS") that must be presented when trying to gain access to an account, either in a similar scenario where a user forgot his or her password, or when users implement what is referred to as "two-factor authentication" (where the password is one factor, and the passcode sent via text message to a mobile device is a second).  In either scenario, the user of a primary email account (a SUBJECT ACCOUNT) and a secondary email account or phone number listed in subscriber records are very often the same person, or at least are close and trusted and/or working in concert.  That is because access to either the secondary email account or to the phone number listed in subscriber records can allow access to the primary account.

29.  Providers also frequently obtain information about the types of devices that are used to access accounts like the SUBJECT ACCOUNTS.  Those devices can be laptop or desktop computers, cellular phones, tablet computers, or other devices. Individual computers or devices are identified by a number of different means, some of which are assigned to a particular device by a manufacturer and connected to the "hardware" or the physical device, some are assigned by a cellular telephone carrier to a particular account using cellular data or voice services, and some are actually assigned by the provider to keep track of the devices using its services.  Those device identifiers include Android IDs, Advertising IDs, unique application numbers, hardware models, operating system versions,

unique device identifiers, Global Unique Identifiers or "GUIDs," serial numbers, mobile network information, phone numbers, device serial numbers, Media Access Control ("MAC") addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"). Apple, one of the primary suppliers of mobile devices used to access accounts like the SUBJECT ACCOUNTS, had previously used an identifier that was unique to the hardware of its devices, such that details of a device's activity obtained from a particular application or "app" could be used to target advertisements for the user of that device.  Apple replaced that hardware-based identifier with the Apple advertiser ID or IDFA that is still unique to a particular device, but which can be wiped and re-generated anew by a user if a user chooses to do so.  Most users, however, do not know that the IDFA exists, and therefore are unaware that their device's activity can be correlated across different apps or services.  Google uses a similar advertiser ID referred to as an AAID.

30.  These device identifiers can then be used (a) to identify accounts accessed at other providers by that same device, and (b) to determine whether any physical devices found in the course of the investigation were the ones used to access a SUBJECT ACCOUNT.  The requested warrant therefore asks for the

device identifiers, as well as the identity of any other account accessed by a device with the same identifier.

## VI.   BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER

31.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account.  Therefore, the contents of a given account, including the email addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that

17

account.  For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

32.  Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

33.  I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the

identified criminal activity, subject to the search procedures
set forth in Attachment B, is necessary to find all relevant
evidence within the account.

34.  This application seeks a warrant to search all
responsive records and information under the control of the
PROVIDER, which is subject to the jurisdiction of this court,
regardless of where the PROVIDER has chosen to store such
information.

35. As set forth in Attachment B, I am requesting a
warrant that permits the search team to keep the original
production from the PROVIDER, under seal, until the
investigation is completed and, if a case is brought, that case
is completed through disposition, trial, appeal, or collateral
proceeding.

a.   I make that request because I believe it might be
impossible for a provider to authenticate information taken from
a SUBJECT ACCOUNT as its business record without the original
production to examine.  Even if the provider kept an original
copy at the time of production (against which it could compare
against the results of the search at the time of trial), the
government cannot compel the provider to keep a copy for the
entire pendency of the investigation and/or case.  If the
original production is destroyed, it may be impossible for the
provider to examine a particular document found by the search
team and confirm that it was a business record of the provider
taken from a SUBJECT ACCOUNT.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VII.  <u>SERVICES PROVIDED AND DATA RETAINED BY OFFERUP</u>

36.  Based on a review of information provided by OfferUp regarding its services and data retention policies, information provided by other ATF SAs, and/or my training and experience, I am aware of the following:

a.   OfferUp owns and operates a free-access web-based application (the "App") and website of the same name that can be accessed at http://www.offerup.com or by downloading the App to iOS or Android devices.  OfferUp allows its users to establish accounts with OfferUp, and users can then use their accounts to post items for sale and make offers to buy items for sale. OfferUp also provides a means for prospective buyers and sellers to communicate with each other through web or App based direct messaging.

b.    OfferUp asks users to provide basic contact and personal identifying information to OfferUp, either during the registration process or thereafter.  This subscriber information may include the user's full name, any alternate names such as a maiden name or nickname, birth date, gender, contact e-mail addresses (including deleted addresses), OfferUp passwords, OfferUp security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  OfferUp stores both current and prior information, such as past addresses or names provided by a user.  OfferUp also assigns a user identification number to each account.

c.    OfferUp offers its account users the opportunity to become a "TruYou" member.  To become a TruYou member, the requesting account user must submit a state issued ID, a cell phone number, and a "selfie" to OfferUp.  This information is not viewable to other members.  Once the information is verified by OfferUp, the requesting account user earns a TruYou badge on their public profile.  The TruYou badge is meant to provide more assurance to prospective buyers and sellers, as TruYou members are viewed as being more trustworthy, as they have been verified by OfferUp.

d.    OfferUp associates its users' accounts by device based on information collected such as connection logs and user log-in and log out activity, and stores information about these linked accounts and devices.  In turn, OfferUp also associates devices to user accounts.

e.   OfferUp allows users to upload photos, which may
include metadata (such as EXIF data)[5] that can indicate, for
example, the user's location when s/he captured or uploaded the
photo or video, and the date and time the image was captured or
uploaded.

f.   OfferUp users can send and receive instant
messages or "chats" through OfferUp for the purpose of engaging
in a transaction and make arrangements for a sale or purchase of
an item.  These communications are stored in the history of
communications for the account.  OfferUp users can also rate and
review the OfferUp profiles of other users; such comments are
typically associated with a specific posting or item and upon
completion of a transaction associated with the profile.
OfferUp stores reviews to a user's own page, as well as reviews
by a user to other peoples' pages and reviews by others to the
user's page.

g.   If an OfferUp user does not want to interact with
another user on OfferUp, the first user can "block" the second
user from seeing his or her account.

h.   OfferUp has a search function that enables its
users to search OfferUp for keywords, usernames, or pages, among
other things.

i.   OfferUp also stores information relating to each
active session by a user, including date, time, device, Internet

---

[5] EXIF stands for "exchangeable image file format," and is a
standard used by digital cameras and other systems handling
image and sound files captured by such devices.  EXIF data is a
term used to refer to certain kinds of metadata associated with
user image files.

Protocol ("IP") address, machine cookie, and browser information.  These session logs may contain information about the actions taken by the user ID or IP address on OfferUp, including information about the type of action, the date and time of the action, and the machine ID, user ID, and IP address associated with the action.  For example, if a user views an item for sale on OfferUp, that user's IP log would reflect the fact that the user viewed the item, and would show when and from what IP address, browser, and device ID the user did so.

j.   Providers like OfferUp typically retain additional information about their users' accounts, such as information about the length of service (including activation date and deactivation, disabling, or deletion dates, if applicable), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, OfferUp users may communicate directly with OfferUp about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Providers like OfferUp typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

k.   OfferUp also allows users to access their account via the OfferUp app on mobile devices.  If the user is accessing the OfferUp app from an Apple device, such as an iPhone or iPad, and has notifications enabled, Apple will assign a "device

23

token" or "push token" to that device for use with the OfferUp app specifically (Apple will assign different tokens for each relevant app, such as Twitter or Instagram).  OfferUp, in turn, will have a record of that device token or push token in its records for the user's account.  Therefore, obtaining the device token or push token number can allow investigators to connect a particular device to access of a person's OfferUp account, which will also allow them to identify the relevant device if electronic devices are recovered later in the investigation.

l.   If a user makes purchases on OfferUp, for example in the app, and gives OfferUp their credit card number for such purchases, OfferUp will retain that number.

37.   As explained herein, information stored in connection with an OfferUp account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the Subject Offenses, or alternatively, to exclude the innocent from further suspicion. In my training and experience, an OfferUp user's IP log, stored electronic communications, and other data retained by OfferUp can indicate who has used or controlled the OfferUp account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and photos (and the data associated with the foregoing, such as date and time) may be

evidence of who used or controlled the OfferUp account at a relevant time.

38.   Further, OfferUp account activity can show how and when the account was accessed or used.  For example, as described herein, OfferUp logs the IP addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crimes under investigation.  Such information allows investigators to understand the geographic and chronological context of OfferUp access, use, and events relating to the crimes under investigation.  Additionally, as described above, OfferUp builds geo-location into some of its services.  This geographic and timeline information may tend to either inculpate or exculpate the OfferUp account owner in crimes under investigation.

39.   Lastly, OfferUp account activity may provide relevant insight into the OfferUp account owner's state of mind as it relates to the offense under investigation.  For example, information on the OfferUp account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement following the commission of a crime).

40.   Therefore, the computers of OfferUp are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of OfferUp, account access information, transaction information, and other account information relevant to the Subject Offenses.

## VIII.        <u>REQUEST FOR NON-DISCLOSURE</u>

41.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNTS, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in (1) flight from prosecution (2) destruction of or tampering with evidence; or (3) otherwise seriously jeopardizing the investigation.  The current investigation set forth above is not public, and I know, based on my training and experience, that people who use social media and the internet to engage in in the illegal, unlicensed sale of firearms often will destroy digital evidence if the people learn of an investigation.  In addition, if the PROVIDER or other person notifies the target of the investigation that a warrant has been issued for a SUBJECT

ACCOUNT, the unidentified person might further mask their
activity and seriously jeopardize the investigation.

## IX.   CONCLUSION

42.   Based on the foregoing, I request that the Court issue
the requested warrant.  The government will execute this warrant
by serving the warrant on the PROVIDER.  Because the warrant
will be served on the PROVIDER, which will then compile the
requested records at a time convenient to it, reasonable cause
exists to permit the execution of the requested warrant at any
time in the day or night.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2021.


_____
UNITED STATES MAGISTRATE JUDGE